UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA and the
STATE OF NEW YORK *ex rel.* GEORGE
R. VITO, *DPM*,

                    Relator/Plaintiff,                                    20-CV-505-LJV
                                                                                   DECISION & ORDER
          v.

JOSEPH R. CANZONERI, *DPM*, *et al.*,

                    Defendants.

_____

          On April 27, 2020, the plaintiff-relator, George R. Vito, filed this action alleging

that the defendants, Joseph R. Canzoneri; Advanced Podiatry Associates, PLLC

("APA"); and Healogics, Inc., violated the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et*

*seq.*, and the New York False Claims Act ("NYFCA"), N.Y. Finance Law § 187 *et seq*.

Docket Item 1.  More specifically, the complaint alleges that the defendants engaged in

schemes to improperly solicit payments from Vito and reuse single-use medication vials.

*Id*.  Vito asserts *qui tam* claims on behalf of the United States and New York State.

Docket Item 28.  He also alleges that the defendants committed common law fraud and

that Canzoneri and APA retaliated against him in violation of the FCA and NYFCA.  *Id.*

          After Canzoneri and APA moved to dismiss the complaint, Docket Item 19, Vito

filed an amended complaint, Docket Item 28.  Canzoneri and APA renewed their motion

to dismiss on July 12, 2021, Docket Item 34, and Healogics filed a separate motion to

dismiss that same day, Docket Item 32.  Vito responded to both motions on July 26,

2021, Docket Item 37, and the defendants replied a week later, Docket Items 38 and 39.

For the following reasons, the defendants' motions to dismiss are granted in part, and the remainder of their motions will be granted unless Vito amends his complaint to correct the deficiencies noted below.

## FACTUAL BACKGROUND[1]

Vito and Canzoneri are both podiatrists who practice in New York State.  Docket Item 28 at ¶¶ 11-12.  Vito previously worked at APA, a professional limited liability company "wholly owned by [] Canzoneri," under "a July 23, 2018 Employment Agreement."  *Id.* at ¶¶ 13, 23.  Under that agreement, Vito and Canzoneri shared hospital privileges at United Memorial Medical Center ("UMMC") in Batavia, New York, where Vito "performed surger[ies]."  *Id.* at ¶ 24.

Vito had some problems at APA.  For example, Canzoneri "insisted [that] Vito . . . pay $250 per procedure to Dr. Canzoneri" even after Canzoneri was "no longer [] scrubbing in for [those] procedures."  *Id.* at ¶ 25.  Vito reported Canzoneri's demands to UMMC's surgery chief in May 2019, *id.*, and sometime after Vito "questioned Dr. Canzoneri's demand for payment," Canzoneri terminated Vito's "employment with APA," *id.* at ¶ 26.

Vito also saw Canzoneri improperly reuse single-use medication vials taken from the UMMC operating room.  *Id.* at ¶ 28.  As part of this scheme, Canzoneri would "treat[] [patients at] Healogics' Wound Care Center[,] br[ing] them to the UMMC Operating Room, use[] medication packaged in single[-]dose vials [there], [and] then t[ake] the

---

[1] On a motion to dismiss, the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

remainder of those partially[-]used medication vials to re-use, with different patients, at his APA practice office."  *Id.*  That improper use "ignored infection control standards and exposed patients to harm and infection."  *Id.* at ¶ 33.  "[P]atients seen in Healogics' Wound Care Center were billed under Healogics' EIN and billing numbers."  *Id.* at ¶ 29.  "[E]ach medication injection" was billed "at approximately $195."  *Id.* at ¶ 30.

Vito raised concerns about this misuse of single-dose medication to UMMC staff and to Canzoneri in April and May 2019; Vito says that "other UMMC operating room nurses [also] knew Dr. Canzoneri had been removing partially[-]used single[-]dose vials out of the hospital" to use in his office.  *Id.* at ¶¶ 34-35, 37-38.  In addition, Vito filed a whistleblower complaint "regarding Dr. Canzoneri's scheme" with the United States Department of Health and Human Services' Office of Inspector General in May 2019. *Id.* at ¶ 39; *see also* Docket Item 36 at ¶ 11.

Eventually, in October 2019, UMMC's Chief Medical Officer sent a memorandum to the UMMC Surgery Department about the problem.  The memorandum noted that UMMC had "received a complaint that partially[-]used single[-]use medications are being removed from the [operating room] for use in a surgeon's office."  Docket Item 28 at ¶ 40.  And it warned that removing single-use medication from the operating room was a "violation of hospital [] policy and Department of Health Regulations" and reiterated that "hospital supplies may not be removed from the hospital to a physician['s] office."  *Id.*

Vito then filed this action on April 27, 2020.  Docket Item 1.  After the United States declined to intervene in February 2021, the case was unsealed, and Vito

pursued his claims as a *qui tam* relator in the name of the United States.  *See* Docket

Item 10.  New York State declined to intervene a month later.  *See* Docket Item 14.

## LEGAL PRINCIPLES

### I.   FAILURE TO STATE A CLAIM

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is

not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

### II.   SUBJECT MATTER JURISDICTION

"It is a principle of first importance that the federal courts are tribunals of limited

subject matter jurisdiction," *Wright v. Musanti*, 887 F.3d 577, 583 (2d Cir. 2018) (citation

omitted), possessing "only that power authorized by Constitution and statute," *Gunn v.*

*Minton*, 568 U.S. 251, 256 (2013).  "Article III of the Constitution limits the jurisdiction of

federal courts to the resolution of 'cases' and 'controversies.'"  *W.R. Huff Asset Mgmt.*

*Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (citing U.S. Const. art.

III, § 2).  Part of the case-or-controversy requirement is that a plaintiff must have

standing.  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) ("If the

plaintiff does not claim to have suffered an injury that the defendant caused and the

court can remedy, there is no case or controversy for the federal court to resolve." (citation and internal quotation marks omitted)).

To satisfy the "irreducible constitutional minimum of standing," a plaintiff must show: (1) that he has "suffered an injury in fact—an invasion of a legally protected interest[,] which is (a) concrete and particularized . . . and (b) actual or imminent[] not conjectural or hypothetical"; (2) that the injury is "fairly traceable to the challenged action of the defendant"; and (3) "that it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations, citations, and internal quotation marks omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

## **DISCUSSION**

### I.    **STATUTORY *QUI TAM* CLAIMS**

"The FCA is an anti-fraud statute that 'may be enforced not just through litigation brought by the [g]overnment itself, but also through civil *qui tam* actions that are filed by private parties, called relators, 'in the name of the [g]overnment.'"[2] *U.S. ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (quoting *Kellogg Brown & Root Servs., Inc. v. U.S. ex rel. Carter*, 575 U.S. 650, 653 (2015)). As relevant here, the FCA provides that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

---

[2] "The NYFCA mirrors the federal FCA, and New York courts look to federal law to interpret the state statute." *U.S. ex rel. Pelullo v. Am. Int'l Grp., Inc.*, 757 F. App'x 15, 17 (2d Cir. 2018) (summary order).

approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is "liable to the United States government."  31 U.S.C. § 3729(a)(1)(A), (B).[3]

"The FCA defines a 'claim' as 'any request or demand for money or property' that is presented, directly or indirectly, to the United States."  *Chorches*, 865 F.3d at 81 (alterations omitted) (quoting 31 U.S.C. § 3729(b)(2)(A)).  "Fraud under the FCA has two components: the defendant must submit or cause the submission of a claim for payment to the government, and the claim for payment must itself be false or fraudulent."  *Id.* at 83 (alterations omitted) (quoting *Hagerty ex rel. U.S. v. Cyberonics, Inc.*, 844 F.3d 26, 31 (1st Cir. 2016)).  Plaintiffs must allege the submission of a false claim to state a viable FCA claim under both subsections 3729(a)(1)(A) and (B).  *See U.S. ex rel. Hussain v. CDM Smith, Inc.*, 2017 WL 4326523, at *8 (S.D.N.Y. Sept. 27, 2017); *see also Chorches*, 865 F.3d at 84.

"*Qui tam* complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b)."  *Chorches*, 865 F.3d at 81.  Rule 9(b) requires a party "alleging fraud or mistake[]" to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "That ordinarily requires a complaint alleging fraud to

---

[3] Vito alleges that the defendants violated 31 U.S.C. § 3721(a)(1) and 31 U.S.C. § 3729(a)(1)(B) in his amended complaint, *see* Docket Item 28 at ¶¶ 57, 60; in his response, Vito cites 31 U.S.C. § 3729(a)(1)(A)-(B), *see* Docket Item 37 at 15.  Because 31 U.S.C. § 3721(a)(1) provides a statutory definition of "agency," the Court assumes that the statutory provision to which Vito refers in the amended complaint should be 31 U.S.C. § 3729(a)(1)(A).

Vito also alleges that the defendants conspired to violate other subsections of the FCA beyond subsections 3729(a)(1)(A) and (B).  *See* Docket Item 28 at ¶ 62.  As set forth below, the amended complaint offers no basis to support Vito's cursory allegations regarding those other subsections.

'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Chorches*, 865 F.3d at 81 (quoting *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016)).  "But 'the adequacy of particularized allegations under Rule 9(b) is case- and context-specific.'"  *Id.* at 81 (alterations omitted) (quoting *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015)).

Vito's amended complaint does not identify any particular false claims that were submitted to the federal and state governments; instead, Vito alleges "[u]pon information and belief" only that such claims were submitted.  *See* Docket Item 28 at ¶¶ 57, 60, 64-65.  The defendants contend that Vito's *qui tam* claims therefore must be dismissed.  *See* Docket Item 33 at 7; Docket Item 34-3 at 4-7.  In response, Vito argues that the Second Circuit's decision in *Chorches* "[r]efut[es] the defense['s] argument here."  Docket Item 37 at 10.  But because the sparse allegations in the amended complaint fall far short of the "plausible and particularized factual allegations" of *Chorches*, 865 F.3d at 85-86, this Court agrees with the defendants that Vito's *qui tam* claims are subject to dismissal.

In *Chorches*, the Second Circuit explained that a *qui tam* relator can satisfy Rule 9(b) without identifying specific claims submitted to the government for payment—in other words, that a *qui tam* relator may plead that claims were submitted on "information and belief" in certain circumstances.  To do so, the relator must raise "plausible allegations creating a strong inference that specific false claims were submitted to the government and that the information that would permit further identification of those

claims is peculiarly within the opposing party's knowledge." *Id.* at 86; *see also U.S. ex rel. Gelbman v. City of New York*, 790 F. App'x 244, 248 (2d Cir. 2019) (summary order) ("[T]o survive dismissal under Rule 9(b) when the complaint pleads only on information and belief that fraudulent claims were actually submitted to the United States, a plaintiff must (1) 'make plausible allegations that the bills or invoices actually submitted to the government were uniquely within the defendant's knowledge and control,' and (2) 'adduce specific facts supporting a strong inference of fraud.'" (alterations omitted) (quoting *Chorches*, 865 F.3d at 83)).  "Those requirements ensure that those who *can* identify examples of actual claims *must* do so at the pleading stage."  *Chorches*, 865 F.3d at 86 (emphasis in original).

The relator's allegations in *Chorches* cleared that bar even though the relator could not identify particular claims submitted for reimbursement.  The relator in *Chorches*, a former emergency medical technician ("EMT") employed at an ambulance company, alleged that his former employer regularly instructed its employees to falsely revise ambulance "run" reports to "ensure that [the] runs would be reimbursable by Medicare, whether or not ambulance service was in fact" reimbursable.  *Id.* at 76.  The relator alleged that his supervisors "specifically instructed EMTs and paramedics how to modify the [reports] by including false or misleading information, and [his supervisors] admitted to [the relator] that the purpose of [the] revisions was to qualify the [ambulance] run for Medicare reimbursement."  *Id.*  Moreover, the relator "identifie[d] more than ten specific runs for which [he] was ordered to alter [reports] to include false or misleading information" and thereby ensure that the runs were reimbursable.  *Id.* at 77.

In light of those specific allegations—in particular, the relator's allegation that his supervisors admitted that "Medicare was the specific target of the fabricated [reports] that the alleged scheme generated"—the Second Circuit concluded that it was "highly implausible . . . that the resulting records were never submitted to the federal government for reimbursement." *Id.* at 85.  What is more, the relator alleged that the defendant's billing practices "made it virtually impossible for most employees to have access to all of the information necessary to certify on personal knowledge both that a particular invoice was submitted for payment and that the facts stated to justify the invoice were false." *Id.* at 82.  Taken together, the Second Circuit therefore concluded that the relator had adequately pleaded the submission of false claims, even though his complaint failed to identify any false claim in particular. *Id.* at 85-86.

Here, by contrast, Vito offers no similar allegations that would raise a "strong inference that [the defendants] did in fact submit false claims to the government." *See id.*  Vito alleges that Canzoneri demanded payment for surgical procedures without "scrubbing in for [those] procedures" and he alleges that Canzoneri improperly reused single-use medication from UMMC in his APA practice office. *See* Docket Item 28 at ¶¶ 25, 28.  Beyond generally alleging the existence of the Medicare and Medicaid programs and broadly identifying certain regulatory requirements, however, Vito fails to allege any facts suggesting that either scheme resulted in the submission of false claims to the government.  Indeed, Vito does not even allege that Canzoneri treated any Medicare or Medicaid patients or point to any "records [that] were in fact falsified." *See Chorches*, 865 F.3d at 84.

Nor does Vito explain why information identifying bills submitted to the government is "uniquely within [the defendants'] knowledge and control." *Id.* at 83.  In a declaration submitted with his response to the motions to dismiss, Vito says that he cannot "provide specific examples of billing" because he was "not [] privy to billing practices by the defendants" after his employment with APA was terminated.  Docket Item 36 at ¶ 8.  But Vito did not make that allegation in the amended complaint.  *See* Docket Item 28.  And even if he had, the allegation does not address why Vito cannot offer any information about bills submitted *during* his employment at APA.  Because Vito's amended complaint does not adequately allege the submission of a false claim and falls short of the bar set in *Chorches*, his *qui tam* claims are subject to dismissal.[4] *See Gelbman*, 790 F. App'x at 249 (affirming "dismissal for failure to satisfy Rule 9(b)'s particularity standard" where the relator failed to allege the submission of false claims and failed to make a satisfactory showing under *Chorches*).

Finally, Vito makes cursory reference to the defendants' "conspir[acy] to [violate] 31 U.S.C. § 3729, [s]ubsections (A), (B), (D), (E), (F) and (G)."  Docket Item 28 at ¶ 62.

---

[4] Because Vito's *qui tam* claims fail under Rule 9(b), this Court need not otherwise address the viability of those claims.  The Court notes, however, that the theory under which Vito intends to proceed is unclear.  "A successful FCA claim generally occurs in one of three forms: (1) a factually false claim; (2) a legally false claim under an express false certification theory; and (3) a legally false claim under an implied certification theory."  *U.S. ex rel. Foreman v. AECOM*, 19 F.4th 85, 104 n.7 (2d Cir. 2021) (citation and internal quotation marks omitted).  In his response, Vito suggests that his claims fit an implied certification theory, *see* Docket Item 37 at 17; Vito does not, however, articulate how the defendants made "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement [that was] material to the [g]overnment's payment decision," *see Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 181 (2016).  In any second amended complaint, Vito should clarify the theory under which he intends to proceed.  *See U.S. ex rel. Gelbman v. City of New York*, 2018 WL 4761575, at *6 (S.D.N.Y. Sept. 30, 2018), *aff'd*, 790 F. App'x 244 (2d Cir. 2019).

Subsections (D) through (G) of the FCA impose liability for claims related to "property or money used[] or to be used[] by the [g]overnment" that a party "has possession, custody, or control of"; "document[s] certifying receipt of property used[] or to be used[] by the [g]overnment"; public property; and "obligation[s] to pay or transmit money or property to the [g]overnment." *See* 31 U.S.C. § 3729(a)(1)(D)-(G).  Because the amended complaint does not refer to any of those categories of property, money, documents, or obligations, this Court can only speculate as to how the defendants conspired to violate those provisions of the FCA.  And for that reason, any claims under those subsections also are subject to dismissal.  *See Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 748 (2d Cir. 2009) (summary order) (affirming dismissal of FCA claim where "the [a]mended [c]omplaint ma[de] no mention of any financial obligation that the [defendants] owed to the government").

In sum, Vito is correct that he need not allege particular false claims to state viable claims under the FCA and NYFCA, but his allegations still must give rise to "a strong inference that specific false claims were submitted to the government."  *See Chorches*, 865 F.3d at 86.  The amended complaint does not make such allegations here.  And for that reason, Vito's FCA and NYFCA *qui tam* claims are subject to dismissal.

## II.    RETALIATION CLAIMS

Vito also brings retaliation claims under the FCA and NYFCA.  Docket Item 28 at ¶¶ 74-87.  Section 3730(h)(1) of the FCA protects an employee against retaliation "because of lawful acts done by the employee[] . . . in furtherance of an action under

this section or other efforts to stop [one] or more violations" of the FCA.[5]  31 U.S.C. §

3730(h)(1).  Just as NYFCA *qui tam* claims parallel FCA claims under section 3729, a

retaliation claim under the NYFCA follows the FCA as well.  *See Dhaliwal v. Salix*

*Pharm., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (summary order).

       To state a claim for retaliation under the FCA, a plaintiff "generally [must] show

that (1) he engaged in activity protected under the statute, (2) the employer was aware

of such activity, and (3) the employer took adverse action against him because he

engaged in the protected activity."  *Id.*  "The inquiry as to whether an employee engaged

in protected conduct involves determining whether an employee's actions sufficiently

furthered an action filed or to be filed under the FCA, and, thus, equated to 'protected

conduct.'"  *U.S. ex rel. Scharff v. Camelot Counseling*, 2016 WL 5416494, at *10

(S.D.N.Y. Sept. 28, 2016) (citation omitted).  "'Protected activity' is interpreted broadly,

and an employee's activities may be protected even where an FCA suit has not been

filed."  *Id.* (citation and internal quotation marks omitted); *see also Dhaliwal*, 752 F.

App'x at 100 (explaining that the FCA prohibits "retaliation against not only those who

actually file a *qui tam* action, but also against those who plan to file a *qui tam* that never

gets filed, who blow the whistle internally or externally without the filing of a *qui tam*

action, or who refuse to participate in the wrongdoing" (italics added) (quoting

*Chorches*, 865 F.3d at 97)).  Thus, it is sufficient "to show that a plaintiff's investigation

reasonably could have led to an FCA action."  *Dhaliwal*, 752 F. App'x at 100 (alterations

and citation omitted).

---

[5] "The particularity requirement of Rule 9(b) does not apply to retaliation claims under the FCA."  *Chorches*, 865 F.3d at 95.

Vito contends that his employment at APA was terminated because of protected

activity.[6]  Specifically, Vito alleges that he engaged in protected activity when he

repeatedly "raised his concerns regarding Dr. Canzoneri's scheme" to "steal, re-use,

and re-bill partially[-]used single[-]dose vial medications previously billed at UMMC."

Docket Item 28 at ¶¶ 32, 34.  Those allegations suggest that he raised concerns about

the scheme to improperly bill reused medication and that Canzoneri knew he did—in

other words, that Vito "engaged in [protected] activity" and that "[his] employer was

aware of [that] activity."  See Dhaliwal, 752 F. App'x at 100.

But regardless of whether those allegations satisfy the pleading standard of Rule

8(a), Vito does not allege that he was terminated because of those complaints.  Instead,

Vito specifically alleges that his "employment with APA was terminated by Canzoneri"

after he "questioned Dr. Canzoneri's demand for payment."[7]  Docket Item 28 at ¶ 26.  In

other words, Vito alleges that he was terminated not for reporting improper reuse of

---

[6] In counts four and five of the amended complaint, Vito asserts that Canzoneri and APA retaliated against him by "initiating a pretextual, baseless summary suspension of Vito's privileges at UMMC."  Docket Item 28 at ¶¶ 77, 84.  Vito does not, however, allege any facts about the "summary suspension of Vito's privileges at UMMC," so this Court limits its consideration of Vito's retaliation claim to Vito's termination.  Likewise, the amended complaint is not a model of clarity as to whether Canzoneri's demand for improper payments was a retaliatory act or the underlying fraudulent scheme that prompted retaliation.  Compare id. at ¶ 77 (alleging Canzoneri and APA retaliated against Vito by "attempting to extort wrongful payments"), with id. at ¶ 78 (alleging that Vito "engaged in activities protected under the FCA by investigating and reporting [] Canzoneri's scheme to . . . attempt to extort wrongful payments from Vito").  In any event, Vito's retaliation claim fails for the reasons stated below.

[7] Vito does not say exactly when he was terminated at APA.  The timing might support a claim that he was terminated for raising concerns about the reuse of single-use medications.  See Scharff, 2016 WL 5416494, at *10 ("The plausibility of [the plaintiff's] retaliation claim is strengthened by the temporal proximity between his communications to supervisors and his subsequent termination.").

single-use medication vials, but instead for objecting to Canzoneri's request that "Vito []

pay $250 per procedure . . . even though Canzoneri would no longer be scrubbing in."[8]

*Id.*

And even under the "relatively low" standard applicable to FCA retaliation claims,

*see Chorches*, 865 F.3d at 95 (citation omitted), the amended complaint does not allege

how Vito's "question[ing]" Canzoneri's request for payments was an "effort[] to stop

[one] or more violations" of the FCA.  31 U.S.C. § 3730(h)(1).  Indeed, only two

sentences of the amended complaint provide the factual basis of Canzoneri's alleged

scheme to solicit payments.  Docket Item 28 at ¶¶ 25-26.  And neither sentence

connects the demand for improper payments *from Vito* to false claims submitted *to the*

*government*; that is, neither sentence shows how Vito's objection to Canzoneri's

"demand for payment" could be an "investigation[] [or] inquir[y] . . . directed at exposing

a fraud upon the government."  *Scharff*, 2016 WL 5416494, at *10 (citation omitted).

Because Vito has not alleged that he was terminated because he engaged in

protected activity, his retaliation claim also is subject to dismissal.[9]

---

[8] And even if Vito's allegations can be read so broadly to suggest that he was
terminated for reporting the reuse of single-use medications, his retaliation claim still
would be subject to dismissal because he does not link that to claims submitted to the
federal or state government.  As noted above, Vito does not even allege that Canzoneri
treated Medicare or Medicaid patients, let alone that reused vials were connected with
them.  Without that connection, Vito's complaints could not "reasonably [] be expected
to prevent the submission of a false claim to the government."  *Chorches*, 865 F.3d at
96.

[9] Because this Court concludes that Vito's retaliation claims cannot proceed
against Canzoneri or APA, it does not reach defendant Canzoneri's argument that those
claims cannot proceed against him individually.  *See* Docket Item 34-3 at 11-12.  To the
extent that Vito intends to raise an "alter ego" theory of liability, however, the sparse
allegations in the amended complaint fail to satisfy the "heavy burden" of demonstrating

III.     **COMMON LAW FRAUD CLAIM**

In addition to his claims under the FCA and the NYFCA, Vito brings a common law fraud claim under New York law.  Docket Item 28 at ¶¶ 69-73.  He alleges that the defendants "commit[ted] common law fraud" by "engag[ing] in false, misleading, and deceptive practices to bill patients, their insurance companies, the United States[,] and [New York State] for re-used medication vials."  Docket Item 28 at ¶ 70.  In other words, Vito seeks to assert a common law fraud claim on behalf of the United States and New York State governments, as well as on behalf of patients and private insurance companies, for injuries suffered by those third parties.[10]

But "[t]here is[] no common law right to bring a *qui tam* action; rather, a particular statute must authorize a private party" to bring suit on behalf of the government.  *See Woods v. Empire Health Choice, Inc.*, 574 F.3d 92, 98 (2d Cir. 2007).  So Vito does not have standing to bring a *qui tam* common law fraud action on behalf of the government. *See id.*  And that is true even though Vito may have suffered some injury unrelated to the injury that a government suffered from the alleged fraud.  *See id.* at 97 ("In a *qui tam* action, a private plaintiff[] . . . brings suit on behalf of the [g]overnment to recover a remedy *for a harm done to the [g]overnment*." (emphasis added)).  Moreover, to the extent that Vito's fleeting references to patients and insurance companies is intended to assert the rights of others not before the Court, any attempt to establish third-party

---

that APA was Canzoneri's alter ego.  *See U.S. ex rel. Brumfield v. Narco Freedom, Inc.*, 2018 WL 5817379, at *2-5 (S.D.N.Y. Nov. 6, 2018).

[10] Vito does not raise a common law fraud claim based on his own payments to Canzoneri for surgeries in which Canzoneri did not participate.  *See* Docket Item 28 at ¶¶ 69-73.

standing falls well short.  *See N.Y. State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019) ("Whatever the status of the third-party standing bar, our cases have developed an exception to it where a plaintiff can show (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." (citation and internal quotation marks omitted)).

Because Vito cannot bring a *qui tam* common law fraud claim, and because he offers no reason why he can assert a common law fraud claim on behalf of other private parties not before the Court, his common law fraud claim is subject to dismissal.

## IV.    LEAVE TO AMEND

Vito does not request leave to amend.  *See generally* Docket Item 37.  And Healogics contends that leave to amend should not be granted because Vito already has amended his complaint once and any further leave to amend "would be futile." Docket Item 33 at 11-12; Docket Item 39 at 9-10.  But because "[d]istrict courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)," this Court grants Vito leave to amend his complaint.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  Within 30 days of the date of this order, Vito may amend his complaint to correct the deficiencies noted above.[11]

Leave to amend any common law fraud claim asserted on behalf of the federal or state government is denied, however, because Vito lacks standing to assert a common

---

[11] Because the Court grants Vito leave to amend his complaint, it does not reach Canzoneri's and APA's request for attorneys' fees and expenses under 31 U.S.C. § 3730(d)(4).  *See* Docket Item 34-3 at 12.

law *qui tam* claim.  Leave to amend that claim therefore would be futile.  *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

## CONCLUSION

For all the above reasons, the defendants' motions to dismiss, Docket Items 32 and 34, are GRANTED in part.  Vito's *qui tam* common law fraud claim is dismissed, and his other claims will be dismissed unless Vito amends his complaint, within 30 days, to correct the deficiencies noted above.  No later than 30 days after any second amended complaint is filed, the defendants may answer, move against, or otherwise respond to the second amended complaint.  If Vito does not amend his complaint within 30 days of the date of this order, then his amended complaint will be dismissed without further order and the Clerk of the Court shall close the case.

SO ORDERED.

Dated:   March 22, 2022
             Buffalo, New York

  */s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE