UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA and the
STATE OF NEW YORK *ex rel.* GEORGE
R. VITO, *DPM*,

        Relator/Plaintiff,

   v.

JOSEPH R. CANZONERI, *DPM*; *et al.*,

        Defendants.

20-CV-505-LJV
DECISION & ORDER

---

On April 27, 2020, the plaintiff-relator, George R. Vito, filed this action against Joseph R. Canzoneri; Advanced Podiatry Associates, PLLC ("APA"); and Healogics, Inc. Docket Item 1. He alleged that Canzoneri, APA, and Healogics violated the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*; the New York False Claims Act ("NYFCA"), N.Y. Finance Law § 187 *et seq.*; and New York State common law by improperly reusing single-use medication vials, soliciting unearned payments from Vito, and retaliating against Vito for objecting to those practices. *See id.*; *see also* Docket Item 28. Vito asserted *qui tam* claims on behalf of the United States and New York State as well as retaliation claims on his own behalf. *See* Docket Item 1; Docket Item 28.

On June 18, 2021, Vito filed an amended complaint. Docket Item 28. The defendants then moved to dismiss the amended complaint, Docket Items 32-34, and on March 22, 2022, this Court granted those motions in part, Docket Item 42. More specifically, the Court dismissed Vito's *qui tam* common law fraud claim without leave to

amend and found that his remaining claims were subject to dismissal but gave him leave to amend those claims.  *See id.*

Vito then filed a second amended complaint, Docket Item 44, and voluntarily dismissed his claims against Healogics, Docket Item 51.  On June 24, 2022, APA and Canzoneri renewed their motion to dismiss, Docket Item 55; on July 8, 2022, Vito responded to that motion, Docket Item 56, and on July 15, 2022, APA and Canzoneri replied, Docket Item 57.

For the reasons that follow, Vito's statutory *qui tam* claims are dismissed because he still has not pleaded the submission of false claims with sufficient particularity.  Vito's retaliation claims against Canzoneri also are dismissed, but his retaliation claims against APA may proceed.

## **FACTUAL BACKGROUND**[1]

Vito and Canzoneri are both podiatrists who practice in New York State.  Docket Item 44 at ¶¶ 11-12.  Vito previously worked at APA, a professional limited liability company "wholly owned by [] Canzoneri," under a "July 23, 2018 Employment Agreement."  *Id.* at ¶¶ 13, 23.  Under that agreement, Vito and Canzoneri shared hospital privileges at United Memorial Medical Center ("UMMC") in Batavia, New York, where Vito "performed surger[ies]."  *Id.* at ¶ 24.

---

[1] The following facts are taken from the second amended complaint, Docket Item 44.  On a motion to dismiss under Rule 12(b)(6), the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

2

Vito says that he witnessed or experienced several problems at APA.  For example, Vito says that "on several occasions[] beginning in March or April 2019," Canzoneri would "treat[] Healogics' Wound Care Center patients, br[ing] them to the UMMC Operating Room, use[] medication packaged in single dose vials, then t[ake] the remainder of those partially used medication vials to re-use, with different patients, at his APA practice office."  *Id.* at ¶ 26.  That improper recycling "of partially used non-sterile contaminated single[-]use medication vials ignored infection control standards and exposed patients to harm and infection."  *Id.* at ¶ 31.

Vito claims that the improper reuse of single-use medication not only exposed patients to harm but also led to the submission of fraudulently inflated bills.  After a podiatrist gives a medication injection, he or she submits a bill to "Medicare, Medicaid, [or] other insurers" for "the physical act [of] giving an injection."  *Id.* at ¶ 36.  But "[i]f a podiatrist bills for the actual medications as well as the physical act of giving the injection, the reimbursement rate is higher."  *Id.* at ¶ 37.

Vito says that Canzoneri took advantage of that higher reimbursement rate and "billed for the actual injection plus the medications, . . . even though [] Canzoneri was often re-using 'no cost' single[-]use vials obtained unlawfully from UMMC."  *Id.* at ¶ 41.  That is, Vito says that "APA's billing was fraudulently inflated" and "resulted in overpayment" because Canzoneri and APA would request reimbursement for both the medication injections and for the single-use medication vials that were pilfered from UMMC.  *Id.* at ¶ 38.  And Vito theorizes that because Canzoneri treated "Medicare and Medicaid patients, and patients who paid with or through private insurer[-]administered Medicare Advantage or Medicare Supplement plans," those fraudulently inflated bills

3

must have been submitted to the United States or New York State governments for reimbursement.  See id. at ¶¶ 46-48.

Vito "raised [] concerns regarding [] Canzoneri's" misuse of single-use medication to UMMC staff and to Canzoneri in April and May 2019; Vito says that "other UMMC operating room nurses [also] knew [] Canzoneri had been removing partially used single[-]dose vials out of the hospital" to use in his office.  Id. at ¶¶ 32-33, 50.  And in May 2019, Vito filed a whistleblower complaint with the United States Department of Health and Human Services Office of Inspector General.  Id. at ¶ 51.

Moreover, on May 31, 2019, Vito "reported [] Canzoneri's re-used sing[le-use] medication vial scheme to UMMC['s] Chief Medical Officer" and "Surgery Department Chair." Id. at ¶ 52.  In addition, he also told the Surgery Department Chair that Canzoneri "insisted Vito continue to pay $250 per procedure to [] Canzoneri, even though Canzoneri would no longer be scrubbing in for such procedures."  Id. at ¶ 53.  The next day, Canzoneri "terminated Vito's employment with APA."  Id. at ¶ 54.

A little more than four months later, UMMC's Chief Medical Officer sent a memorandum to the UMMC Surgery Department about the improper reuse of single-use medication vials.  Id. at ¶ 55.  That memorandum noted that UMMC had "received a complaint that partially used single[-]use medications [were] being removed from the [operating room] for use in a surgeon's office."  Id.  And it warned that removing partially used single-use medication from the operating room was a "violation of hospital [] policy and Department of Health regulations," noting that "hospital supplies may not be removed from the hospital to a physician['s] office."  Id.

4

Toward the end of 2019, Vito met with federal and state officials about Canzoneri's scheme to improperly reuse single-use medication vials. *See id.* at ¶¶ 61-64. Vito then filed this action on April 27, 2020. Docket Item 1. After the United States declined to intervene in February 2021, the case was unsealed, and Vito pursued his claims as a *qui tam* relator in the name of the United States. *See* Docket Item 10. New York State declined to intervene about a month later. *See* Docket Item 14.

## LEGAL PRINCIPLES

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

**I.    STATUTORY *QUI TAM* CLAIMS**

"The FCA is an anti-fraud statute that 'may be enforced not just through litigation brought by the [g]overnment itself, but also through civil *qui tam* actions that are filed by private parties, called relators, in the name of the [g]overnment.'"[2]  *U.S. ex rel.*

---

[2] "The NYFCA mirrors the federal FCA, and New York courts look to federal law to interpret the state statute." *U.S. ex rel. Pelullo v. Am. Int'l Grp., Inc.*, 757 F. App'x 15,

5

*Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Kellogg Brown & Root Servs., Inc. v. U.S. ex rel. Carter*, 575 U.S. 650, 653 (2015)). As relevant here, the FCA provides that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" is "liable to the United States government."[3] 31 U.S.C. § 3729(a)(1)(A); *see also* N.Y. Finance Law § 189(1)(a) (parallel provision of the NYFCA).

"The FCA defines a 'claim' as 'any request or demand for money or property' that is presented, directly or indirectly, to the United States." *Chorches*, 865 F.3d at 81 (alterations omitted) (quoting 31 U.S.C. § 3729(b)(2)(A)); *see also* N.Y. Finance Law § 188(1) ("'Claim' [] means any request or demand, whether under a contract or

---

17 (2d Cir. 2018) (summary order). This Court therefore considers Vito's FCA and NYFCA claims simultaneously.

[3] In his first amended complaint, Vito alleged that Canzoneri and APA violated 31 U.S.C. § 3729(a)(1)(A) and (B). *See* Docket Item 28 at ¶¶ 55-62. Vito omitted the reference to 31 U.S.C. § 3729(a)(1)(B) in his second amended complaint, *see* Docket Item 44 at ¶¶ 80-88, so this Court considers only whether Vito has sufficiently alleged that APA and Canzoneri violated 31 U.S.C. § 3729(a)(1)(A).

Vito also cursorily alleges that Canzoneri and APA "committed and conspired to commit violations of . . . 31 U.S.C. § 3729(a)(1)(A) and (E). *Id*. at ¶ 88. It is not at all clear from the second amended complaint how section 3729(a)(1)(E), which relates to "document[s] certifying receipt of property used, or to be used, by the [g]overnment," *see* 31 U.S.C. § 3729(a)(1)(E), is relevant to Vito's claims. And Vito offers only a fleeting reference to any conspiracy to violate the FCA; in fact, Vito's conspiracy claim rests on his bare assertion that the defendants "conspired to commit violations of" two sections of the FCA. *See* Docket Item 44 at ¶ 88. Those conclusory allegations, without more, are not sufficient to state a conspiracy claim. *See U.S. ex rel. Duhaine v. Apple Health Care Inc.*, 2022 WL 3226631, at *9 n.27 (D. Conn. Aug. 10, 2022) (dismissing FCA conspiracy claim that "improperly rests on speculation and conclusory allegations"). Therefore, to the extent that Vito asserts that Canzoneri and APA violated 31 U.S.C. § 3729(a)(1)(E) and conspired to violate 31 U.S.C. § 3729(a)(1)(A) and (E), those claims are dismissed.

6

otherwise, for money or property that [] is presented to an officer, employee[,] or agent of the state or a local government."). "Fraud under the FCA has two components: the defendant must submit or cause the submission of a claim for payment to the government, and the claim for payment must itself be false or fraudulent." *Chorches*, 865 F.3d at 83 (alterations omitted) (quoting *Hagerty ex rel. U.S. v. Cyberonics, Inc.*, 844 F.3d 26, 31 (1st Cir. 2016)).

"*Qui tam* complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b)." *Id.* at 81; *see also U.S. ex rel. SW Challenger, LLC v. EviCore Healthcare MSI, LLC*, 2021 WL 3620427, at *7 (S.D.N.Y. Aug. 13, 2021) ("Rule 9(b) also applies to claims brought under state analogues of the FCA in federal court."). That rule requires a party "alleging fraud or mistake" to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "That ordinarily requires a complaint alleging fraud to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Chorches*, 865 F.3d at 81 (quoting *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016)). "But 'the adequacy of particularized allegations under Rule 9(b) is case- and context-specific.'" *Id.* (alterations omitted) (quoting *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015)). And in some circumstances, a *qui tam* relator can satisfy Rule 9(b) without identifying specific claims submitted to the government; in other words, a *qui tam* relator can plead the existence of those claims "on information and belief." *See id.* at 86-89.

To do so, however, a relator must provide "plausible allegations creating a strong inference that specific false claims were submitted to the government and that the information that would permit further identification of those claims is peculiarly within the opposing party's knowledge."  *Id.* at 86; *see also U.S. ex rel. Gelbman v. City of New York*, 790 F. App'x 244, 248 (2d Cir. 2019) (summary order) ("[T]o survive dismissal under Rule 9(b) when the complaint pleads only on information and belief that fraudulent claims were actually submitted to the United States, a plaintiff must (1) 'make plausible allegations that the bills or invoices actually submitted to the government were uniquely within the defendant's knowledge and control,' and (2) 'adduce specific facts supporting a strong inference of fraud.'" (alterations omitted) (quoting *Chorches*, 865 F.3d at 83)).  "Those requirements ensure that those who *can* identify examples of actual claims *must* do so at the pleading stage."  *Chorches*, 865 F.3d at 86 (emphasis in original).

In its prior decision, this Court found that Vito's FCA and NYFCA *qui tam* claims were subject to dismissal because he had neither alleged the submission of particular false claims nor offered factual allegations that gave rise to "a strong inference that specific false claims were submitted to the government."  *See* Docket Item 42 at 11 (quoting *Chorches*, 865 F.3d at 86).  Vito now provides some additional context for his assertion that Canzoneri's improper recycling of single-use medication vials led to the submission of false claims to the federal and state governments.  But Vito's second amended complaint still lacks the sort of specificity that is necessary to allege *qui tam* claims under the FCA or NYFCA.

8

In his second amended complaint, Vito alleges that Canzoneri improperly took single-use medication vials from UMMC to reuse with different patients at the APA office.  Docket Item 44 at ¶ 26.  And Vito says that both he and Canzoneri "regularly and consistently treated Medicare and Medicaid patients, and patients who paid with or through private insurer[-]administered Medicare Advantage or Medicare Supplement plans."  *Id.* at ¶ 46.

Vito then provides information about general billing practices at the APA office, including the "APA office billing codes used for injection[s]."  *Id.* at ¶ 45.  He also says that "each medication injection, which might include short-term and long-term anesthetics and/or steroids, is normally billed by a podiatrist[] in an office or clinic setting at $120.00-$195.00."  *Id.* at ¶ 28.  Vito says that "Medicare, Medicaid, and other insurers" generally pay more when a podiatrist "bills for the actual medications as well as the physical act of giving [an] injection."  *Id.* at ¶¶ 36-37.  Finally, Vito offers a broad overview of "pertinent Medicare and Medicaid program requirements," including the general "requirement that providers be truthful in submitting claims for reimbursement," which "is a precondition for participation in the Medicare program, the Medicaid program, and other federally funded healthcare programs."  *Id.* at ¶ 78.

Essentially, Vito reasons that Canzoneri and APA must have submitted false bills to the federal and state governments because Canzoneri (1) reused single-use medication vials when he treated some patients, (2) billed for those improperly reused vials, and (3) treated some patients who were insured by Medicare, Medicaid, or other "private[-]insurer administered Medicare Advantage or Medicare Supplement plans."  *Id.* at ¶ 48.  But those allegations amount to nothing more than "a course of conduct or

9

scheme which [Vito] assumes culminated with the submission of claims." *See Ameti ex rel. U.S. v. Sikorsky Aircraft Corp.*, 2017 WL 2636037, at *6 (D. Conn. June 19, 2017). That is, this Court can only speculate about whether Canzoneri or APA actually reused single-use medication vials for Medicare or Medicaid patients—and submitted false bills to the federal and state governments for those reused vials—or whether those costs were instead passed on only to patients or private insurers.[4] That sort of speculation is not enough to support a "strong inference that specific false claims were submitted to the government." *Chorches*, 865 F.3d at 86; *see also U.S. ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 917 (8th Cir. 2014) (contrasting inadequate claims brought by a relator "who had no direct connection to the hospital's billing or claims department and could only speculate that false claims were submitted" with claims brought by a relator who "oversaw Planned Parenthood's billing and claims systems[] and was able to plead personal, first-hand knowledge of Planned Parenthood's submission of false claims").

Indeed, Vito himself suggests that his claims rest on little more than speculation: He alleges that "*[t]o the extent* [] Canzoneri and/or APA billed for" the single-use medications that may have been used for Medicare or Medicaid patients, those bills were "fraudulently inflated and resulted in overpayment." *See* Docket Item 44 at ¶ 48.

---

[4] In fact, because Vito does not allege facts suggesting that the defendants actually billed for the medication taken from a pilfered single-use vial, the Court would have to speculate about that as well. In other words, Vito simply assumes that the defendants billed for the reused single-use vials the same way that they billed when using fresh vials. And while Vito provides information about his own billing practices and suggests that he may have unwittingly billed for single-use medication vials, *see* Docket Item 44 at ¶¶ 42, 56, he says nothing about why he cannot allege specifics even about those bills that he submitted.

So Vito implicitly admits that he does not know whether Canzoneri ever used those partially used medications for Medicare or Medicaid patients, let alone that Canzoneri then passed consequently inflated bills on to the federal or state government.

Nor has Vito alleged that "the information that would permit further identification of [false] claims is peculiarly within the opposing part[ies'] knowledge." *Chorches*, 865 F.3d at 86. Vito says that he "was not directly involved in billing at [] Canzoneri's office[] where issued bills were made payable to APA or . . . Canzoneri." Docket Item 44 at ¶ 45. But elsewhere in the second amended complaint, Vito *does* provide information about Canzoneri's billing practices. *See, e.g.*, *id.* at ¶ 39 ("Canzoneri did not use a 'superbill' form, with itemized breakdowns of the billing components, for procedures at the APA office."). What is more, Vito alleges that he may have unknowingly completed false claims himself: He says that "before [he] discover[ed] the multitude of single[-]dose vials in a storage cabinet at the APA office," he "unwittingly us[ed] partially used single[-]dose medication vials illegally procured by Canzoneri" and then submitted bills "using Medicare or Medicaid approved billing forms." *Id.* at ¶ 56. But Vito does not explain how he now knows that he "unwittingly" used partially used vials, nor does he say why he cannot provide additional information about the bills that he submitted or why that information would be "peculiarly within the opposing part[ies'] knowledge." *Chorches*, 865 F.3d at 86.

Vito primarily leans on four appellate court decisions in contending that his claims are viable here: *Chorches*; *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201 (9th Cir. 2019); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009); and *United States ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13 (1st Cir.

11

2009).  *See* Docket Item 56 at 17-21.  But a closer look at those decisions further illustrates why Vito's second amended complaint does not clear the Rule 9(b) bar.

First, as this Court discussed in its prior decision, *see* Docket Item 42 at 8-9, the relator in *Chorches* offered allegations clearly suggesting both the existence of a specific scheme to fraudulently bill Medicare and Medicaid and the submission of false claims as a result of that scheme.  In *Chorches*, a former emergency medical technician ("EMT") alleged that his supervisors "specifically instructed EMTs and paramedics how to modify" ambulance "run" reports to "ensure that [those] runs would be reimbursable by Medicare" and Medicaid.  *Chorches*, 865 F.3d at 76.  In fact, the relator's supervisors "admitted to [him] that the purpose of [the] revisions was to qualify the [ambulance] run for Medicare reimbursement."  *Id.*  And the relator "identifie[d] more than ten specific runs for which [he] was ordered to alter [reports] to include false or misleading information" to ensure that the runs were reimbursable.  *Id.* at 77.

Likewise, the relator in *Godecke*, a former employee of a "specialized billing company," alleged specific details of a scheme to submit false requests for reimbursement from Medicare.  *Godecke*, 937 F.3d at 1205.  More specifically, the relator in that case alleged that a medical device company knowingly used incorrect billing codes for medical devices that were delivered before any physician submitted a "detailed written order" for the device, even though that written order was required for reimbursement.  *Id.* at 1206-07.  The relator offered "fifteen representative examples of false claims that were submitted for reimbursement," which she identified by "cross-referencing" a group of claims with an internal company report.  *Id.* at 1207.  Using that report, the relator "rule[d] out" the possibility that the medical device company's claims

accurately disclosed the basis for the claims. *Id.* at 1209. And the relator also alleged that she discussed this billing problem with a former colleague, who "confirmed to [the relator] that she personally saw that claims . . . had routinely been billed to Medicare, and paid by Medicare, even though" those claims were not reimbursable. *Id.* at 1210 (internal quotation marks omitted).

In *Grubbs*, the Fifth Circuit similarly concluded that a relator's complaint was sufficient "even though it d[id] not include exact billing numbers or amounts." *Grubbs*, 565 F.3d at 192. There, the relator, a former psychiatrist at a Texas hospital, alleged that he was asked to participate in a fraudulent scheme to bill for "face-to-face physician visits that had not occurred." *Id.* at 184. The relator was told about that fraudulent billing scheme by several doctors and by nursing staff, and a hospital administrator impliedly confirmed the existence of the scheme when the relator raised questions. *See id.* In addition to describing the scheme, "the complaint aver[red] at least one overt act of false billing for each doctor" who participated in the scheme: for example, the relator alleged that "Dr. Desai billed Medicaid for psychotherapy services on January 8, 2004, CPT Code #90805, which constituted a false claim in that the medical records indicate that no psychotherapy was provided by Desai on that date." *See id.* at 184-85. So the relator's complaint "set[] out the particular workings of a scheme" to submit fraudulent bills to Medicare and Medicaid, which was based on information "that was communicated directly to the relator by those perpetrating the fraud." *Id.* at 191. In other words, the relator in *Grubbs* alleged facts supporting a strong inference that fraudulent bills were submitted to the government because those involved in the

scheme personally informed the relator that they submitted such fraudulent bills and then tried to rope him into the scheme.

Finally, the First Circuit in *Duxbury* reversed dismissal of an FCA claim on the grounds that the relator sufficiently alleged the submission of false claims, even though the relator had not provided "details as to each false claim." *Duxbury*, 579 F.3d at 29. In that case, the relator, a former sales representative for a pharmaceutical company, alleged that the company provided "free commercially packaged" drug product to healthcare providers to artificially inflate the price of that drug product; those providers in turn requested reimbursement for the free distributions. *See id.* at 17, 29-30. The relator identified "eight healthcare providers" that submitted false claims, and included "information as to the dates and amounts of the false claims filed by these providers with the Medicare program." *See id.* at 30. Based on those allegations, the First Circuit concluded that the relator "ha[d] identified, as to each of the eight medical providers (the who), the illegal kickbacks (the what), the rough time periods and locations (the where and when), and the filing of the false claims themselves."[5] *Id.*

In sum, those four cases were brought by relators who offered detailed allegations, based on their own personal knowledge, to support their claims that false claims were submitted *to the government*. Here, by contrast, Vito only speculates that partially used single-use medications were in fact used for Medicare or Medicaid

---

[5] Even though the First Circuit found that those allegations satisfied Rule 9(b), it explicitly acknowledged that the issue was a "close call." *Duxbury*, 579 F.3d at 30; *see also U.S. ex rel. Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 124 (1st Cir. 2013) (characterizing the allegations in *Duxbury* as "barely adequate").

patients and improperly billed to the federal or state government.  *See* Docket Item 44 at ¶ 48.

But as *Chorches* makes clear, a relator cannot "base claims of fraud on speculation and conclusory allegations."  *Chorches*, 865 F.3d at 86 (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).  Instead, Rule 9(b) requires that a relator not simply detail a fraudulent scheme, but provide allegations that "support[] a strong inference that false claims were submitted *to the government*."  *Id.* (emphasis in original).  Because Vito has not "state[d] with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and because his allegations are grounded in speculation about bills that might have been submitted, his statutory *qui tam* claims are dismissed.[6]

## II.   RETALIATION CLAIMS

Section 3730(h)(1) of the FCA protects an employee against retaliation "because of lawful acts done by the employee[] . . . in furtherance of an action under this section or other efforts to stop [one] or more violations" of the FCA.  31 U.S.C. § 3730(h)(1); *see also* N.Y. Finance Law § 191(1) (NYFCA anti-retaliation provision).  Just as NYFCA *qui tam* claims parallel FCA claims under section 3729, retaliation claims under the NYFCA follow the FCA as well.  *See Dhaliwal v. Salix Pharms., Ltd.*, 752 F. App'x 99, 100 (2d

---

[6] Although "[c]omplaints dismissed under Rule 9(b) are almost always dismissed with leave to amend," further leave to amend may be denied where a plaintiff "already had one opportunity to plead fraud with greater specificity."  *See Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (citation and internal quotation marks omitted); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (affirming dismissal without further leave to amend after the plaintiff already "was given th[e] opportunity" to amend its complaint to satisfy Rule 9(b) but failed to do so).  Vito had that opportunity here, and he does not give any further indication of how he could allege viable *qui tam* claims.

Cir. 2019) (summary order).  Unlike statutory *qui tam* claims, however, retaliation claims under the FCA and NYFCA are not subject to Rule 9(b).  *See Chorches*, 865 F.3d at 95; *see generally Dhaliwal*, 752 F. App'x at 100.

To state a claim for retaliation under the FCA, a plaintiff "generally [must] show that (1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity."  *Dhaliwal*, 752 F. App'x at 100.  "The inquiry as to whether an employee engaged in protected conduct involves determining whether an employee's actions sufficiently furthered an action filed or to be filed under the FCA, and, thus, equated to 'protected conduct.'"  *U.S. ex rel. Scharff v. Camelot Counseling*, 2016 WL 5416494, at *10 (S.D.N.Y. Sept. 28, 2016) (citation omitted).

"'Protected activity' is interpreted broadly, and an employee's activities may be protected even where an FCA suit has not been filed."  *Id.* (citation and internal quotation marks omitted); *see also Dhaliwal*, 752 F. App'x at 100 (explaining that the FCA prohibits "retaliation against not only those who actually file a *qui tam* action, but also against those who plan to file a *qui tam* [action] that never gets filed, who blow the whistle internally or externally without the filing of a *qui tam* action, or who refuse to participate in the wrongdoing" (italicization added) (quoting *Chorches*, 865 F.3d at 97)).  Thus, it is sufficient "to show that a plaintiff's investigation reasonably could have led to an FCA action."  *Dhaliwal*, 752 F. App'x at 100 (alterations and citation omitted); *see also Hayes v. Dep't of Educ. of City of N.Y.*, 20 F. Supp. 3d 438, 443 (S.D.N.Y. 2014) ("There is no question that if [the p]laintiff has properly pleaded a claim for retaliation, she is permitted to do so irrespective of the fate of her FCA *qui tam* claim.").

In its prior decision, this Court found that Vito's retaliation claims were subject to dismissal because he alleged that he was fired not because of any protected activity but because he "object[ed] to Canzoneri's request that Vito pay $250 per procedure even though Canzoneri would no longer be scrubbing in."  Docket Item 42 at 13-14 (alterations, citation, and internal quotation marks omitted).  In his second amended complaint, Vito now says that Canzoneri terminated his employment at APA shortly after Vito "reported [the] single[-]dose reuse issue to the United States Department of Health & Human Services" and to the UMMC Chief Medical Officer and Surgery Department Chair.[7]  Docket Item 44 at ¶¶ 51-52.

As noted above, a plaintiff can allege that he engaged in protected activity for purposes of an FCA or NYFCA retaliation claim by "show[ing] that [his] investigation reasonably could have led to an FCA [or NYFCA] action."  *Dhaliwal*, 752 F. App'x at 100 (alterations omitted).  Here, Vito says that he flagged the improper reuse of single-use medication vials to both the federal government and to UMMC, *see* Docket Item 44 at ¶¶ 51-52, and that his employment at APA then was almost immediately terminated, *see id.* at ¶ 54.  And Vito says that after his termination, he met with federal and state investigators, presumably to inform them about his belief that Canzoneri was fraudulently billing the federal and state government.  *See id.* at ¶¶ 61-64 (alleging that

---

[7] In his second amended complaint, Vito again alleges that he told UMMC's Surgery Department Chair that Canzoneri "insisted Vito continue to pay $250 per procedure to [] Canzoneri, even though Canzoneri would no longer be scrubbing in for such procedures."  Docket Item 44 at ¶ 53.  But as this Court noted in its prior decision, Vito has not explained how that demand for improper payments from him relates to any false claims submitted to the federal or state government.  *See* Docket Item 42 at 14.

Vito met with various federal and state officials, including "investigator[s] at the New York Attorney General Medicaid Fraud Unit's office").

So Vito says that he raised concerns about Canzoneri's improper reuse of single-use medication vials and was immediately fired. And Vito says that both before and after his termination, he brought those concerns to federal and state officials who investigate fraud on the federal and state governments. Drawing every inference in Vito's favor, as it must at this stage, *see Trs. of Upstate N.Y. Eng'rs Pension Fund*, 843 F.3d at 566, this Court concludes that Vito has shown that his investigation "reasonably could have led to an FCA [or NYFCA] action," *Dhaliwal*, 752 F. App'x at 100 (alterations and citation omitted). Vito therefore has sufficiently alleged retaliation claims against APA under the FCA and NYFCA.[8]

---

[8] Although APA and Canzoneri argue that Vito has not established that he engaged in protected activity, they do not address whether he has alleged the remaining elements of a retaliation claim with respect to his termination. This Court therefore assumes that APA was aware about Vito's protected activity. And the short temporal gap between Vito's complaints and his termination "support an inference of retaliation" for purposes of his FCA and NYFCA retaliation claims. *See, e.g.*, *U.S. ex rel. O'Toole v. Cmty. Living Corp.*, 2020 WL 2512099, at *12 (S.D.N.Y. May 14, 2020).

This Court agrees with APA and Canzoneri, however, that Vito has not alleged a viable retaliation claim with respect to the suspension of his hospital privileges at UMMC. *See* Docket Item 44 at ¶ 98. As noted above, a plaintiff alleging a retaliation claim must allege that his "*employer* took adverse action against him because he engaged in [] protected activity." *Dhaliwal*, 752 F. App'x at 100 (emphasis added). But Vito says that UMMC, not APA or Canzoneri, suspended his hospital privileges. *See* Docket Item 44 at ¶ 98. And Vito offers nothing more than his own speculation that either Canzoneri or APA was somehow involved in that suspension. *See, e.g.*, Docket Item 44-1 (detailing Vito's "beli[ef that] his summary suspension was instigated by . . . Canzoneri as retaliation"). Without some further factual basis for attributing UMMC's actions to his employer, Vito cannot maintain a retaliation claim based on UMMC's suspension of his privileges.

Vito cannot, however, maintain his retaliation claims against Canzoneri. Other courts in this Circuit have concluded that "there is no individual liability for retaliation under" the FCA or NYFCA. *See, e.g.*, *McKoy v. Uliss*, 2017 WL 2963456, at *2 (E.D.N.Y. July 11, 2017) (collecting cases). And while some courts have suggested that an individual might be liable as the alter ego of a corporation, *see, e.g.*, *U.S. ex rel. v. Brumfield v. Narco Freedom, Inc.*, 2018 WL 5817379, at *3 (S.D.N.Y. Nov. 6, 2018) (collecting cases), Vito's bare assertion that APA is "the alter ego of Canzoneri," Docket Item 44 at ¶ 23, falls well short of pleading the facts necessary to pursue that theory of liability. *See Brumfield*, 2018 WL 5817379, at *3-4 (outlining standard for alter ego liability); *see also McKoy*, 2017 WL 2963456, at *4 (dismissing claim against individual where "all [the] plaintiff has alleged is that [the defendant] controls his corporation"). Vito's retaliation claims against Canzoneri therefore are dismissed.

## CONCLUSION

For the reasons stated above, APA's and Canzoneri's motion to dismiss, Docket Item 55, is GRANTED in part and DENIED in part. Vito's FCA and NYFCA retaliation claims against APA may proceed, but his remaining claims are dismissed. The Clerk of the Court shall terminate Canzoneri as a defendant to this case.

SO ORDERED.

Dated:   June 20, 2023
         Buffalo, New York


                                           /s/ Lawrence J. Vilardo
                                          LAWRENCE J. VILARDO
                                          UNITED STATES DISTRICT JUDGE